### Emeline Dugan v. Laura E. Daniels, Executrix.

1. NEW TRIALS—*In Courts of Equity.*—Courts of equity grant new trials in no case except on clear and satisfactory proof by evidence of a conclusive or decisive character which upon a new trial would produce a different result.

Dugan v. Daniels.

**Bill for New Trial.**—Appeal from the Circuit Court of Greene County; the Hon. GEORGE W. HERDMAN, Judge, presiding. Heard in this court at the May term, 1895. Affirmed. Opinion filed December 6, 1895.

J. S. CARR, attorney for appellant.

O. B. HAMILTON, attorney for appellee.

MR. PRESIDING JUSTICE PLEASANTS DELIVERED THE OPINION OF THE COURT.

The matter here in controversy is a claim filed in the County Court, September 23, 1893, by appellant against the estate of Frances Milton, her mother, for $5,876. On hearing there it was disallowed, and likewise on her appeal taken to the Circuit Court, from which judgment no appeal was prosecuted; but on August 28, 1894, five months after it was rendered, the bill herein was filed to obtain a new trial on the ground of newly discovered evidence. On final hearing upon the pleadings and proofs a decree dismissing it was entered, and thereupon this appeal taken.

The substance of the bill is that about July 1, 1872, the testatrix was justly indebted to complainant in the sum of $2,600, for rent of her real estate and for moneys and property of said complainant, had, received and appropriated by said testatrix to her own use; that complainant, then intending and having made preparation to commence suit for the recovery thereof, the testatrix requested her not to do so and promised that in that case she would pay it by legacy in her will; and that complainant accepted said promise and relying upon it, did not bring the suit; the testatrix died August 11, 1893, leaving a will, which has been duly probated and by which she bequeathed to complainant the sum of $1,000, and nothing more; that this was not intended as a payment in whole or part of said sum of $2,600, and that she never did pay it or any part of it or make any provision for its payment; that there never was any written or documentary evidence of the claim, and the only evidence introduced by complainant on the hearing or trial to prove

it was the oral testimony of John Dugan, her husband, which the Circuit Court ruled out on the ground that he was not a competent witness; that before and after the filing and each trial of her claim she used every effort in her power to find proof, and sought for and questioned every person she could have any reason to suppose might have any knowledge concerning it, but without success; that those she knew could have substantiated it were all dead; and so she submitted it to trial with the conviction that there was no living witness by whom she could prove it except her husband, and upon the advice of counsel that he was competent. But after the close of the term at which the judgment of the Circuit Court was rendered and the fact and result of the trial had become publicly known and generally talked about in the county, by mere chance, in the course of conversation about it, she learned of five persons (named) who knew that Frances Milton was indebted to her in the sum of $2,600, and who will testify, if a new trial shall be granted, that she admitted said indebtedness and that in consideration of complainant's forbearance to sue her for it she promised complainant to make it good to complainant at her, said Frances', death, by legacy in her will.

The bill was sworn to, and on demurrer was afterward amended by appending thereto the affidavits of four or five persons named as newly discovered witnesses. The answer denied all the allegations relating to the merits of the claim.

Complainant gave the names of twenty-five of whom she had in person made inquiry, and stated that she had written to others, respecting their knowledge of the claim, but none of them had any. The five referred to, however, testified to separate verbal admissions made by the testatrix to them or in their hearing respectively. With one exception these were all long past—from eight to twenty-two years, and with one other, all in the course of casual conversation which the witness had never mentioned until after the trial below. In two of these no amount was stated nor anything said of a will. A third was flatly contradicted by the only person living of those who were said to have been

Dugan v. Daniels.

present on the occasion. A fourth put the amount at "between $2,500 and $2,600, somewheres along there; part of it was rent money that was coming to Mrs. Dugan; two different times, somewhere about $600 is what she told me." There were other amounts stated which he couldn't remember. This was in December, 1861.

The fifth was a conversation in complainant's sitting room between her and her mother, overheard by the witness, who was in the kitchen adjoining. Complainant threatened to sue for $2,500 or more, and her mother begged her not to do it. After hearing all he cared to, he took a cup and went out to the well. While there Mr. Dugan returned from town and they went to the kitchen together. Dugan stepped to the open door and told his wife he hadn't brought the suit, and why. Mrs. Milton asked him whom he was going to sue, and he answered, "you." She then asked him how much they claimed, and he said $2,500 or better, upon which she made the promise alleged in the bill, and complainant expressly accepted it. The witness was working for Dugan and talked with him "lots of times" about the conversation between the women. Dugan knew he was in the kitchen from the time he came back from the well, after which the conversation was continued for some time. The witness was there until Mrs. Milton left. He unhitched her horse for her. After she came out of the house she repeated the promise. Complainant then said, "Now you hear that, don't you, John?" and the witness, whose name was John, answered "Yes." It is claimed that this question was intended for her husband, but enough appears, aside from that, to raise the question of *laches* as to that witness. For it is apparent that the claim must have been based on what is alleged to have occurred on that occasion. Mrs. Milton was then first impressed with the idea that there was an actual intention on the part of complainant to commence a suit against her at once, which could be averted only by some definite arrangement, and then the definite promise was made and the condition expressly agreed to by complainant. If it had been made before, there was no oc-

casion for it then, and if then, none afterward. The bill
states it as made " on or about the first day of July, 1872,"
and the witness fixes the time of this conversation as " in
the summer of 1872, just before harvest." Neither com-
plainant nor her husband could well have forgotten that this
witness was there and would probably know something
about it. That in searching for some one by whom to prove
it, under the pressure of such a necessity, they never once
thought of their hired man, who was in the kitchen at the
time, with the middle door into the sitting room open, who
unhitched her mother's horse when she left, and responded
to her appeal to bear witness to the alleged promise, is a cir-
cumstance that may cast some suspicion upon the good faith
of a claim based upon it. Both have seen and talked with
him about it since the trial, and now, twenty-two years after
the conversation, in which he had no interest and has never
mentioned since about three days after it occurred, he re-
calls distinctly just enough of it to fit and support the alle-
gation of the bill, and attempts to give the words in which
the material parts of it were expressed.

It was essential that appellant should prove a promise to
pay by legacy. Mere admission of indebtedness and dec-
laration of intention to pay in that way would not suffice
against the statute of limitations. There must be a promise,
founded on sufficient consideration, to pay a sum certain, or
one that could be made certain, or at least a definite mini-
mum. Witnesses, such as were introduced, might understand
a mere admission of indebtedness as a promise to pay. Only
two show a definite minimum, of whom one was directly
contradicted as to his entire statement of what the deceased
said. No two heard the same statement, and neither had
the slightest interest in it when made, and many years had
elapsed to dim their recollection.

Mrs. Milton lived for more than twenty-one years after
the alleged promise, and it might well be expected that even
a daughter and a son-in-law who could threaten and prepare
to sue her, would have required better evidence of the prom-
ise and better security for its performance, which might be

so long deferred, than mere words spoken, and especially if spoken, as they understood, only in the presence of those who would not be competent to prove them.

But however difficult it may be to account for this testimony, except upon the supposition of its truth, it is no less difficult to account for its truth in view of the evidence on the part of the appellee, which seems to show beyond controversy that neither in 1872 nor at any time afterward was Mrs. Milton indebted to the complainant in any amount whatever, and must have known it. From the records of the County Court and recorder of deeds of Jersey county the facts appear as follows :

The parties are half-sisters—daughters of the testatrix. Her first husband was George W. Fitzgerald, who died Oct. 19, 1851, leaving his widow, and Caroline, Emeline (the appellant) and George W. his only children and heirs at law. The inventory of his estate shows eighty acres of land, and personal property appraised at $702.95—no more. The widow's award was $386, leaving $316.95 to be applied to funeral expenses, costs of administration and debts. Of what remained, if anything, the widow was entitled to one third, and the children, in equal parts, to the balance.

On April 8, 1854, Henderson Benson, their grandfather, was duly appointed guardian. He died December 4, 1861, and letters of administration upon his estate were granted to Robert F. Benson and George E. Warren.

The widow was married March 18, 1853, to Charles Milton, who, on January 21, 1862, was appointed guardian of the three children of Fitzgerald. On February 17, 1862, a claim was allowed against the estate of Benson, the former guardian, in favor of the wards, of $1,000.26, and the report of the administrators shows its payment in full ($1,054.26) to Charles Milton, guardian, January 8, 1863.

Report of Charles Milton, guardian, of February 17, 1864, shows his receipt of it, and a balance due the wards, in his hands at that date, of $1,952.50.

Appellant attained her majority November 4, 1868, and very soon thereafter was married to John W. Dugan. The

report of Charles Milton of February 20, 1869, shows the
total amount then in his hands, as guardian, belonging to
the three children, was $2,370.04; settlement with appellant,
and payments to her, for which she gave him her receipt,
covering payment of $95 in June, 1866; $20 in October of
the same year; $376.56 in December, 1867, and $433.80 in
January, 1869, the last being expressed to be "in full of my
share of the money in his hands, belonging to Caroline,
George W. and the undersigned," which was duly approved
by the County Court.

On January 29, 1869—nearly a month before—being then
of full age and married, appellant and her husband con-
veyed to Charles Milton her undivided one-third inter-
est in the eighty acres of which her father died seized, for
$1,800, reserving a vendor's lien which was canceled upon
payment in full in January, 1871.

Her mother's dower in that farm was not assigned until
September 6, 1859. It was shown by the testimony of
Joseph W. Fitzgerald, a brother of appellant's father, who
lived on an adjoining farm, that the widow with her chil-
dren, including appellant, all lived on the eighty acres, as a
family, from the time of her husband's death until appel-
lant was married.

Counsel has omitted from the abstract all the particulars
of the accounts and reports of the guardians and administra-
tors, giving only those above stated, for the reason assigned
that appellant's claim is for an indebtedness admitted by the
testatrix after they were rendered and approved. But no
attempt was made to show when, where or how, or on what
account it arose, except that one witness said "part of it
was rent money that was coming to Mrs. Dugan, two dif-
ferent times—somewhere about $600 is what she told me;"
and one other that "she talked over, that she hadn't paid
Emmy all the Fitzgerald estate."

It does not appear that anything was due her from the
personal estate, nor is it at all probable, from the amount
inventoried and allowance for widow's award, the correct-
ness of which is not questioned. Appellant's then possessory

Dugan v. Daniels.

interest in the realty was not more than eighteen acres— one-third of two-thirds of eighty. Her own receipt shows that she has been paid what would amount to about $3 per acre, from the date of her father's death until she sold and conveyed all of her interest in it, although her mother's dower was not assigned until nearly eight years after her husband's death. A guardian was appointed within two and a half years, who might have had it assigned sooner, but we can not say that his failure to do so was against the interests of his wards. Their step-father might have reasonably claimed that their interest in the rent should be applied toward their support, which was derived in part from his labor on the land; and yet their guardian's estate paid them $1,000 for what he received for them from some source, in less than eight years, or until the dower was assigned. A witness for appellant testified that he was told by the first guardian and by Mrs. Milton that he rented the land to her; but on cross-examination said the arrangement, as they stated it, was that she " was to have the place to maintain the children until they became twelve years of age, and after that he was to take it and charge her for rent."

All this evidence, documentary and oral, was competent and pertinent to the question whether the alleged admissions of indebtedness were in fact made. If the fact was that she was not so indebted and knew she was not, the inference is strong that there was some misunderstanding or dishonesty on the part of the witnesses who testified to them, and if they were made as testified, are not binding. Those claimed were said to have been made to different witnesses, separately and alone; neither directly corroborates any other, or had any interest in the matter to attract their special attention to what was said. They were casually made, a long time before, by a person whose lips are sealed and can not contradict or explain. According to their statements, no other contradiction but proof as to the fact said to have been admitted was possible, because no other person, competent and living, was present (except in one instance, where direct

contradiction was made). It is to be noticed, also, that the claim in controversy is not based upon an alleged settlement by compromise of a doubtful one, but upon the allegations of an absolutely valid and subsisting indebtedness, which makes its validity, and not the admissions, which are but evidence of it, the vital question.

Two trials of it have been had with the same result. Whether the husband was admitted as a competent witness on the first does not appear; but if his exclusion on the last was a surprise (which it ought not to have been in view of repeated decisions of the Supreme Court in Shaw v. Shoonhoven, 130 Ill. 455, and the two other cases there cited) appellant should have taken a non-suit.

Courts of equity grant new trials in courts of law in no case except on clear and satisfactory proof (T., W. & W. Ry. Co. v. Ingram, 85 Ill. 173), by evidence of a conclusive or decisive character (Woodside v. Morgan, 62 Id. 283), which upon a new trial would produce a different result (Coalsen v. Leitch, 110 Id. 508).

We do not believe that the testimony of the newly discovered witnesses in this case can, would or should produce that effect. The record evidence shows that the testatrix was not indebted to appellant, whatever she may have said, and probably never said what is attributed to her. The indebtedness rather appears to have been the other way. For her will, dated July 27, 1893, only a fortnight before her death, and long after her husband's estate was settled and appellant formally acknowledged the receipt of all she was entitled to receive from it, bequeathed to appellant, as her "beloved daughter," $1,045, consisting of one promissory note of Oct. 5, 1892, for $360, payable to her order and signed by John W. Dugan and appellant, his wife; one other note of April 2, 1892, for $85, payable one day after date to her order, and signed by John W. Dugan; and $600 in money.

For the reasons stated we are of opinion that the decree dismissing her bill was right, and it will be affirmed.